BECKWITH, Associate Judge:
On January 8, 2011, and then again on February 4, 2011, police arrested appellant Lamont Biles for peddling counterfeit DVDs at the Florida Avenue flea market in northeast Washington, D.C. Mr. Biles was later convicted, in a separate bench trial for each incident, of attempted deceptive labeling in violation of D.C.Code § 22-3214.01(d)(1) (2001).
*1015 On appeal from his convictions, Mr. Biles contends that the government’s mid-trial disclosure in the first case of facts indicating that police had illegally searched Mr. Biles’s backpack and his stash of DVDs kept him from filing what would have been a winning suppression motion and violated his right, under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), “to use the favorable material effectively in the preparation and presentation of [his] case,” Miller v. United States, 14 A.3d 1094, 1107 (D.C. 2011) (quoting Edelen v. United States, 627 A.2d 968, 970 (D.C.1993)). This late disclosure, he says, “continued to prejudice the defense” in his second case. The government counters that it is not clear or obvious, under the plain-error standard of review it urges us to use, that Brady applies to suppression hearings; that in any event Mr. Biles obtained the information in time to make good use of it; and that Mr. Biles’s Fourth Amendment argument fails on the merits because he had no reasonable expectation of privacy in the items that were searched. Finding the government’s arguments untenable, we .reverse Mr. Biles’s convictions.
I. Background
Mr. Biles’s bench trial for the January 8 incident began in Superior Court on April 11, 2011. Officer William Wilson of the Metropolitan Police Department (MPD) testified that he was walking the flea market in plain clothes, “trying to observe any criminal activity,” when Mr. Biles approached and asked if he wanted to buy any DVDs. Officer Wilson made “eye to eye contact” with Mr. Biles, “told him no, I don’t need any DVDs,” and then reported the incident to Officer Diane Davis, a uniformed MPD officer also on patrol. Officer Davis testified that when she approached Mr. Biles shortly thereafter, he “just indicated he was not selling DVDs.” She arrested and handcuffed Mr. Biles and, “[wjithin a moment” of the arrest, received a phone call from a paid confidential informant who could see the officers.
Over the phone, the informant directed Officer Davis to a box beside “door number two” — one of three doorways into the market building, located approximately eight feet from where Mr. Biles had been standing — and stated, “That Mr. Biles, that’s where he stores his movies.” A stack of crates approximately three feet high sat next to the doorway, and as Officer Davis testified, a “box was sitting on top of the crates, and there was a knapsack bag that was on top of the box.” Lifting up the backpack, Officer Davis discovered DVDs in the box. Opening the backpack, she found Mr. Biles’s personal identification card and his Social Security card.[1] A government expert later testified that the DVDs were counterfeit.
When Officer Davis testified that “[t]he source phoned me” and “directed me to the location of the box,” defense counsel asked to approach and objected that “[t]here’s no mention whatsoever” in the pretrial discovery materials “of a source giving any kind of direction,” and that “we’ve never heard anything of it before this testimony.” Defense counsel argued that “I didn’t have an opportunity to do motions” or to “investigate it,” and asked the court to “exclude any evidence [found] as a result of the tip.” When the prosecutor said that he himself had learned about the informant “maybe 10 minutes before this case began” and had not realized that *1016 the informant had not been disclosed before trial “as part of police paperwork,” the court told the prosecutor that “that was three hours ago and you should have told counsel as soon as you found out,” “because she may have had a motion available' to her.” When the prosecutor proposed limiting Officer Davis’s testimony, the trial court interrupted that “[w]ell, you really can’t, because it’s how she got to the box,” and continued:
The court: “I mean it’s fundamental because it’s what led them to the box. Otherwise they wouldn’t have gone to the box.”
The prosecutor: “Right.”
The court: “I mean but for that phone call.”
The prosecutor: “That’s right.”
The court: “Because it’s not at all the way it was posited with respect to the opening [statement] that they just found it incident to the arrest, like it was right there by him.... ”
The trial court nevertheless rejected the defense’s oral motion to suppress the fruits of the informant’s tip on two grounds— first, that “the confidential informant was not the reason why the defendant was stopped and about to be arrested,” and second, that “the defendant has never asserted the DVDs were his. So there’s a standing issue. I mean the only thing to suppress is the DVDs, and he’s never asserted they’re his, and so he doesn’t really have standing to, I think probably to try to suppress it.” The trial court concluded that'“I think that sort of closes the door on anything further with respect to the confidential informant.” The court then allowed the government to finish its case in chief and postponed the remainder of the trial to give the defense the additional time it requested to investigate the informant. The defense presented no witnesses when the trial resumed on May 4, 2011.
The trial court found Mr. Biles guilty of attempted deceptive labeling. In its findings of fact, the court noted that the backpack, which “had Mr. Biles’s personal information in there,” was “covering up the top of the DVDs, protecting it from sight.” Mr. Biles was guilty, the court found, even though he “didn’t have the DVDs on-him” — much like some “drug transactions,” where “somebody is going to keep their stash nearby where they know it’s safe and in their line of sight so it can’t be taken by anybody else, but also not on them so they can walk away and not be held accountable.” The court further credited Officer Wilson’s testimony that Mr. Biles “looked right at him and said I have DVDs for sale.”
In a separate trial on April 18, 2011, Mr. Biles was convicted of attempted deceptive labeling for the February 4 incident, based largely upon Officer Davis’s testimony that she linked the DVDs found in that case to Mr. Biles based on her observation of Mr. Biles’s backpack near them — a backpack she knew was Mr. Biles’s because of the identification cards found inside during the January 8 search. Mr. Biles appealed both convictions.
II. Analysis
Mr. Biles argues that his first conviction must be reversed on grounds that the government’s midtrial disclosure on April 11 — specifically, that Officer Davis had uncovered the DVDs and his identification cards through a warrantless search of his belongings — violated his due process rights under Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
The Due Process Clause of the Fifth Amendment to the U.S. Constitution requires that the government timely disclose to the defense information that is *1017 “favorable to an accused,” id. at 87, 83 S.Ct. 1194; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 768, 31 L.Ed.2d 104 (1972), whether the accused requests it or not, Strickler v. Greene, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (citing United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). The government’s disclosure obligations encompass information known to’ police even if unknown to the prosecutor. Kyles v. Whitley, 514 U.S. 419, 438, 115 S.Ct. 1555,131 L.Ed.2d 490 (1995).
“There are three components of a true Brady violation”: the disputed information must be (1) “favorable to the accused, either because it is exculpatory, or because it is impeaching,” (2) “suppressed” by the government, “either willfully or inadvertently,” and (3) material. Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936. Information is material when “there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A reasonable probability of a different result occurs when the suppression “undermines confidence in the outcome of the trial.” Kyles, 514 U.S. at 434, 115 S.Ct. 1555 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. 3375). When the information is favorable, suppressed, and material, we must reverse “irrespective of the good faith or bad faith of the prosecution.” Brady, 373 U.S. at 87, 83 S.Ct. 1194. The burden is on Mr. Biles to prove a Brady violation. Mackabee v. United States, 29 A.3d 952, 959 (D.C.2011).
A. Whether the Information Was Favorable
The government’s sole argument on the question whether Officer Davis’s testimony about the discovery of Mr. Biles’s belongings was “favorable” for Brady purposes is that Mr. Biles did not sufficiently preserve his Brady claim, and that under the plain-error standard of review of United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), he cannot demonstrate that it is “clear” and “obvious” that Brady applies to suppression hearings.[2] The government does not argue that the late disclosure of information material to the outcome of a pretrial suppression hearing cannot violate Brady, aside from saying the law is not clear. Instead, the government leaves for the second and third prongs of Brady its fallback arguments, contending that “even if this Court concludes that appellant has preserved his Brady claim, the claim still fails because appellant cannot show that the government suppressed the material or a reasonable probability of a different outcome.”
The record in this case makes sufficiently clear that the trial court was fairly apprised of the nature of Mr. Biles’s claim. When Officer Davis first testified that an informant had phoned her and directed her to the DVDs, defense counsel asked the court to exclude the evidence stemming from this call, stating that there was “no mention whatsoever” of this information in pretrial discovery materials, that she had “never heard anything of it before this testimony,” and that she “didn’t have an opportunity to do motions” or “an opportunity to do anything on this.” The trial judge then described the withheld information as “fundamental because it’s what led them to the box” and chided the prosecutor that he “should have told counsel as soon as [he] found out” because Mr. Biles’s counsel “may have had a motion *1018 available to her.” While counsel did not invoke Brady by name, the claim she was making had the clear hallmarks of a Brady claim — that the government failed to disclose information favorable to the accused’ that would have made a difference to the outcome of the proceeding — and it is preserved for appellate review. See, e.g., Parsons v. United States, 15 A.3d 276, 279 (D.C.2011) (holding that defense counsel’s request to exclude seized drugs, combined with counsel’s closing argument that evidence of the informant’s reliability was “insufficient and not correct,” was enough to preserve for appeal a Fourth Amendment claim); Tindle v. United States, 778 A.2d 1077, 1081 (D.C.2001) (holding that Mr. Tindle preserved his claim under Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), even though neither the attorneys nor the trial judge mentioned Edwards).
Turning to the merits, the government, again, identifies no reason Brady should not apply to the failure to disclose information material to suppression hearings, and we likewise find no basis in our case law. We have repeatedly held that information tending to show the inadmissibility of government evidence is “favorable” evidence that must be disclosed under Brady. In Gaither v. United States, 759 A.2d 655 (D.C.2000), amended by 816 A.2d 791 (D.C.2003), we remanded for findings on whether the government had withheld Brady information pertaining to suggestive identification procedures. In Smith v. United States, 666 A.2d 1216, 1224-25 (D.C.1995), we held that the government violated Brady by failing to disclose a witness statement that undermined the admissibility of a government witness’s purportedly spontaneous utterance. And in James v. United States, 580 A.2d 636 (D.C.1990), we similarly evaluated under Brady a late-disclosed witness statement that “cast[ ] serious doubt” upon the trial court’s finding that another statement it admitted “was truly spontaneous.” Id. at 638.
And while we have never had occasion to explicitly address whether information is “favorable” for Brady purposes if it relates to a defendant’s claim at a Fourth Amendment suppression hearing rather than at trial, we have assumed as much in at least one case. In Porter v. United States, 7 A.3d 1021 (D.C.2010), Eugene Porter contended that his due process rights under Brady were violated when the government failed to turn over information about an informant that, in Mr. Porter’s view, would have shown that police lacked probable cause to arrest and search him and that his motion to suppress evidence should have been granted. Id. at 1023. This court, never questioning that Brady applied in such circumstances, held that the information at issue “was not material to the defense” given that the informant did not testify and that the police were not aware of the information when they decided to arrest and search Mr.' Porter.[3] Id. at 1026.
*1019 The only courts we know to have squarely addressed the issue on the merits have held that the failure to disclose information material to a ruling on a Fourth Amendment suppression motion can constitute a Brady violation.[4] In Smith v. Black, 904 F.2d 950, 965-66 (5th Cir.1990), vacated on other grounds, 503 U.S. 930, 112 S.Ct. 1463, 117 L.Ed.2d 609 (1992), the government failed to disclose evidence that would have bolstered the impeachment of a detective who testified at a suppression hearing involving the warrantless seizure of evidence from the defendant’s ear and home. The Fifth Circuit concluded that “objections may be made under Brady to the state’s failure to disclose material evidence prior to a suppression hearing,” id. at 965, and that “the appropriate assessment for Brady purposes” was whether the nondisclosure “affected the outcome of the suppression hearing,” id. at 956-66. In United States v. Gamez-Orduno, 235 F.3d 453 (9th Cir.2000), the government failed to timely disclose a codefendant’s statement that contradicted the government’s assertion that the defendants lacked standing to challenge on Fourth Amendment grounds the Border Patrol’s warrantless search of the trailer where the defendants resided. The Ninth Circuit concluded that “[t]he suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.” Id. at 461.[5] In addition, at least one court has *1020 held that Brady applies to suppression hearings alleging Miranda violations. See Nuckols v. Gibson, 233 F.3d 1261, 1266-67 (10th Cir.2000) (finding a Brady violation where “the prosecution withheld evidence that would have allowed defense counsel the means to test [the police officer’s] credibility” where the admissibility of Mr. Nuckols’s confession “hinged upon proof’ that he initiated the interview).[6]
We agree that the suppression of material information can violate due process under Brady if it affects the success of a defendant’s pretrial suppression motion. We have described as “eminently sensible” a broad formulation of the government’s Brady obligation that would reach the kind of evidence “that would suggest to any prosecutor that the defense would want to know about it,” Miller v. United States, 14 A.3d at 1110 (quoting Leka v. Portuondo, 257 F.3d 89, 99 (2d Cir.2001)); see also Mackabee, 29 A.3d at 962 (D.C. 2011), and a rule prohibiting the government from suppressing favorable informa-tibn material to a Fourth Amendment suppression hearing would impose little if any additional burden on prosecutors and police beyond the obligations that court rules and professional standards already impose. See, e.g., USAM § 9-5.001.C.2 (requiring disclosure of information that “might have a significant bearing on the admissibility of prosecution evidence”); D. MASS. L.R. -116.1(c)a)(B) (requiring that the government disclose within 28 days of arraignment a written description of an incriminating warrantless search, including an inventory of items seized); D. MASS. L.R. 116.2(a)(2) (requiring disclosure of information that “tends to ... cast doubt on the admissibility of evidence that the government anticipates offering in its case-in-chief’).[7]
Having held that the failure to disclose information material to a pretrial suppression ruling can implicate Brady, we conclude that the withheld information here, which tended to show that the search could not be justified as a routine search of a suspect’s wingspan incident to arrest, was favorable for purposes of the Brady doctrine.
*1021 B. Whether the Information Was Suppressed
To prove a Brady violation, a defendant must show not only that the information at issue was “favorable” to the accused, but that it was “suppressed.” Evidence is “suppressed” for Brady purposes if the government failed to disclose it “in time to permit [the defense] to contemplate its implications” and to make “new investigative, strategic and tactical decisions,” “not only in the presentation of its case, but also in its trial preparation.” Miller, 14 A.3d at 1111-12. “[Wjhere disclosure of Brady is concerned, there is no time for strategic delay and ‘as soon as practicable’ should be the approach.” Vaughn v. United States, 93 A.3d 1237, 1257 (D.C.2014) (quoting Miller, 14 A.3d at 1111). See also United States v. Coppa, 267 F.3d 132, 142 (2d Cir.2001) (requiring disclosure “no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made”); Edelen v. United States, 627 A.2d 968, 970 (D.C.1993) (disclosure must be “at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pretrial disclosure”) (quotation marks and citation omitted). Here, the government says it did not suppress information about the true basis for the post-árrest search of the DVD stash and backpack because Mr. Biles still had “plenty of time to make effective use of it” during the lengthy continuance from April 11 to May 4.
After a full review of the record, we conclude that the government’s untimely midtrial disclosure of a completely new and different basis for the search — that is, the government’s disclosure that the DVDs and items in Mr. Biles’s backpack were not, in fact, retrieved from the area of Mr. Biles’s wingspan, incident to arrest — denied Mr. Biles a fair opportunity to challenge the legality of the search. In the confused aftermath of Officer Davis’s unexpected testimony about the informant and the warrantless search, counsel tried to quickly digest the import of the new information, orally moved to “exclude” the evidence, and asked permission to question Officer Davis at length about the informant. The trial court allowed questioning about the informant’s prior cases but denied the request to exclude the fruits of the search, and in the process made clear its position that Mr. Biles lacked standing to move to exclude the fruits of the search on any basis because he “has never asserted the DVDs were his,” telling counsel “that sort of closes the door on anything further with respect to the confidential informant.” Thus, even if counsel had possessed the wherewithal in the wake of the belated disclosure to think beyond the informant-related issues and to appreciate the full legal significance of the warrant-less search, she had no reason to further move to suppress the fruits of the search on any basis after the trial court’s standing ruling. Counsel “cannot be faulted for believing that, by then, the die had been cast.” Brooks v. United States, 39 A.3d 873, 882 (D.C.2012). See also Wilkins v. United States, 582 A.2d 939, 942 n. 7 (D.C. 1990) (noting that “defense counsel did not need to object again to preserve his claim of error on appeal” once the court “implicitly overruled [an] objection”); United States v. Freeman, 357 F.2d 606, 613 (2d Cir.1966) (concluding that a colloquy with counsel “sufficiently enlightened the court as to the point being raised,” and that any further showing would have been “an exercise of futility”).
Given the strength of Mr. Biles’s would-be claim that the warrantless search did not fit within any recognized exception to the warrant requirement, and the fact that *1022 Officer Davis’s unexpected disclosures ran directly counter to the version of the facts presented by the government in documents previously given to counsel,[8] it is hard to read counsel’s failure' to further pursue the suppression issue as logically attributable to anything but the trial court’s dismissive ruling and the “hasty and disorderly conditions under which the defense was forced to conduct its essential business.” Miller, 14 A.3d at 1113 (quoting Leka, 257 F.3d at 101).[9] As for the government’s suggestion that Mr. Biles should have sought reconsideration of the court’s standing ruling, we have rejected the notion that when forced to respond to belatedly disclosed material, counsel must “evaluate immediately all potential ramifications of the evidence ‘or else waive the right to complain later.’ ” Miller, 14 A.3d at 1114 (quoting James, 580 A.2d at 643). While an “ideally vigilant” lawyer may have quickly produced authority to persuade the trial court that Mr. Biles did have standing to challenge the search, Mr. Biles was not required to seek reconsideration of the trial court’s decision. See James, 580 A.2d at'644 (“[Ajppellant’s failure to move for a mistrial or to ask the court to revisit its spontaneous utterance ruling does not bar his claim here.”); S.E.C. v. May hew, 121 F.3d 44, 53-54 (2d Cir.1997) (“Generally, a party disadvantaged by a district court’s ruling is not required to move for reconsideration in the district court as a precondition to an appeal from the ruling.”).
In sum, the government’s belated mid-trial disclosure of the true basis for the search, coupled with the trial court’s standing ruling, closed the door on any future Fourth Amendment suppression motion. It thus foreclosed any meaningful opportunity on Mr. Biles’s part “to use the information with some degree of fore *1023 thought,” Miller, 14 A.3d at 1112, and to frame and litigate what should have been a successful motion.[10]
C. Whether the Information Was Material
Mr. Biles argues that information about the warrantless search of his belongings was material for Brady purposes because had he known about it, he could have filed a timely suppression motion that would have been granted, thus depriving the government of the most important evidence in its case — the DVDs and the identification cards linking Mr. Biles to the DVDs. He argues that because this scenario would have resulted in an acquittal or dismissal, he has demonstrated a reasonable probability — in fact, much more than a reasonable probability — that “had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Bagley, 473 U.S. at 682, 105 S.Ct. 3375. Based on our review of the record and the relevant case law, we agree.
“ ‘[Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.’ ” Arizona v. Gant, 556 U.S. ,332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) (quoting Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). In defending the legality of the warrant-less search in this case, the government does not rely on the trial court’s “standing” ruling — which it appears to agree was erroneous[11] — or the search-incident-to-ar *1024 rest warrant exception, which it agrees does not apply.[12] Rather, the government relies solely on an abandonment argument. In its view, “Officer Davis did not invade any reasonable expectation of privacy on appellant’s part when she first moved the backpack to see the DVDs, and then looked inside that backpack” because Mr. Biles “abandoned the DVD stash and his backpack by leaving them in a public area” and by telling Officer Davis that he “was not selling DVDs.” Because he had no reasonable expectation of privacy, the government argues, there was no “search” implicating the Fourth Amendment, the discovered items would not have been suppressed, and there was no reasonable probability of a different outcome.
We do not agree that Mr. Biles’s statement to Officer Davis that he “was not selling DVDs” indicates that Mr. Biles relinquished an expectation of privacy in the contents of the backpack — which Mr. Biles never mentioned in the statement — or in the box of DVDs beneath the backpack. At the time of the statement, the police had not seen or been alerted to the existence or location of the backpack or box of DVDs, which were sitting eight to ten feet away. The trial court’s findings also indicate that the items were not discarded or exposed to public view. In explaining its judgment that Mr. Biles was guilty of attempted deceptive labeling, the trial court found that the backpack was “covering up the top of the DVDs, protecting it from sight” and that by keeping “his knapsack on top of’ the DVDs, Mr. Biles “in essence, was claiming dominion and control and keeping it in place and securing it for himself and covering it so others wouldn’t see what was under there.” He knew they were “safe and in [his] line of sight so [they could not] be taken by anybody else.”
Thus, while the events took place in a “public” market, Mr. Biles’s expectation, manifest in his actions and in no way contradicted by his response to police inquiries, was that the items would remain private. See Katz, 389 U.S. at 351, 88 S.Ct. 507 (“What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.”) (citations omitted); id. at 352, 88 S.Ct. 507 (noting that the appellant acted to exclude the “uninvited ear” by shutting the phone booth door); Brown v. United States, 627 A.2d 499, 503-04 (D.C.1993) (considering whether appellant “took reasonable precautions to maintain privacy” and concluding that by leaving the door open, he had not). This case thus differs from cases in which a movant seeks to discard an item or places it in public view. See, e.g., Allison v. United States, 623 A.2d 590, 591 (D.C.1993) (concluding that the appellant abandoned his gun by discarding it while fleeing a police officer). Other than Mr. Biles’s statement and the items’ location, the government suggests no basis — and we see none — for finding that he relinquished his expectation of privacy. This expectation, moreover, was not defeated merely because Mr. Biles stood in a public market; rather, it remained “one that society is prepared to recognize as *1025 ‘reasonable,’” Katz, 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring), particularly where Mr. Biles kept his belongings protected from view and “in [his] line of sight.”
Because Mr. Biles had a reasonable expectation of privacy in his belongings and because the warrantless search of those items did not fall within an exception to the Fourth Amendment’s warrant requirement, the DVDs hidden under his backpack and the identification cards recovered from the backpack should have been suppressed. See United States v. Chadwick, 433 U.S. 1, 15, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (prohibiting “warrantless searches of luggage or other property seized at the time of an arrest” unless conducted incident 'to arrest or in exigent circumstances). Without the DVDs, the government could not prove that the DVDs were counterfeit, and without the identification cards, the government would have had trouble linking Mr. Biles to the DVD stash. We accordingly find a reasonable probability that the government’s failure to timely disclose the information affected the outcome of the trial by preventing Mr. Biles from litigating a winning motion to suppress the government’s most damning evidence against him. The government’s suppression of this information therefore “undermines confidence in the outcome of the trial,” and requires reversal of Mr. Biles’s first conviction. Kyles, 514 U.S. at 434,115 S.Ct. 1555.
D. Effect on the Second Trial
We reverse Mr. Biles’s second conviction for attempted deceptivé labeling because the government in the second trial heavily relied on the same evidence illegally obtained in the earlier January 8 incident, and there is “a reasonable probability that, had the evidence been disclosed to the defense” in the first trial, as we have concluded that it should have been, the result of the second trial “would have been different.” Bagley, 473 U.S. at 682, 105 S.Ct. 3375.[13]
On February 4, 2011, the same Officer Davis arrested Mr. Biles for peddling counterfeit DVDs at the Florida Avenue flea market, again on an informant’s tip. At trial on April 18, 2011, Officer Davis testified that Mr. Biles did not possess DVDs on his person and that she did not see Mr. Biles sell DVDs. But she did see a backpack about eight feet away that was “distinct” to her because she “recognized it” from her previous arrest.[14] She “went over and recovered the property and then [she] brought that property back to show him what [she] had recovered.” She then searched the backpack, which contained “nothing that had Mr. Biles’[s] name on it.” She nonetheless recognized it as Mr. Biles’s because she had searched it on January 8, when his “personal property was inside the book bag with his name on it.” The backpack had been leaning against a stack of crates, and atop the crates, Officer Davis found a shoe box containing 52 DVDs.[15] In closing argu *1026 ment, the government emphasized that “the one fact in this case that links and ties the defendant to these DVDs” is that Officer Davis “saw the defendant’s own bag, the bag she knew was his, next to the crate where the DVDs were located,” and “[t]he fact that his bag is there is the one thing that harms their case, and they can’t get past it.” Judge Alprin found Mr. Biles guilty based in part on “pretty strong evidence in the case that this was Mr. Biles[’s] backpack” and that “the DVDs in controversy” were sitting near the bag. Defense counsel asked the trial court to reconsider and “appreciate that the prior arrest may have influenced your decision,” to which the court replied: “The arrest didn’t. The circumstances of it did, though.”
The government argues that Mr. Biles’s Brady claim with respect to this second trial fails “for the same reasons” as the first, but we have already rejected those reasons. Nor do we agree that Mr. Biles “had enough time to make sufficient use of the material” in the second trial, where the court in the first trial foreclosed that opportunity by ruling that Mr. Bilés lacked standing to challenge the search.[16] Officer Davis’s testimony that on January 8, Mr. Biles’s “personal property was inside the book bag with his name on it” became the predominant evidence of guilt at this trial. Nothing else so definitively linked Mr. Biles to the shoebox of DVDs, as the police did not see Mr. Biles selling DVDs and did not find DVDs in his physical possession when searching him incident to arrest. Absent this testimony, derived from the illegal search on January 8, we do not have confidence in the outcome of the trial.
III. Conclusion
Until the arresting officer took the witness stand at trial, the defense did not know that the government had conducted a warrantless search of Mr. Biles’s belongings that could not be justified under any exception to the warrant requirement. The officer’s disclosure of the true basis for the search — an informant’s tip, rather than a search incident to arrest — was favorable to a winning Fourth Amendment motion that would have excluded key evidence of guilt in both trials. Yet in the chaotic aftermath of the midtrial disclosure, and following the trial court’s ruling that Mr. Biles lacked standing to further argue for exclusion of the items, Mr. Biles could not make effective use of the disclosed information. As there is “a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,” [17] Bagley, 473 U.S. at 682, 105 S.Ct. 3875, we reverse the judgments of conviction and remand Mr. Biles’s cases for further proceedings consistent with this opinion.[18]
So ordered.

. The record does not indicate whether Mr. Biles saw the search. Officer Davis testified that two police officers on the scene "walked Mr. Biles over to the [police] vehicle as [she] simultaneously had gone over to the box.” Mr. Biles was already handcuffed and under arrest when police received the informant’s call.

. The heading for the government's argument on the favorability prong reads: “The Material Was Not Plainly Exculpatory or Impeaching.”

. Many courts have similarly assumed without deciding that such information can be favorable for Brady purposes. See, e.g., United States v. Veras, 51 P.3d 1365, 1375 (7th Cir.1995) (finding "no fault" with the district court's conclusion that “ '[b]ecause the suppressed evidence would not have affected the outcome of the suppression hearing or the trial, defendant’s due process rights were not violated and his motion for a new trial pursuant to Brady and Giglio is denied’ ”); United States v. Williams, 10 F.3d 1070, 1077 (4th Cir.1993) ("[W]e assume arguendo but decline to address definitively on the merits the issue of whether Brady should call for disclosure of material evidence at pre-trial suppression hearings” because ”'[t]he evidence allegedly withheld by the’ government regarding conflicting eyewitness reports was not material to the determination of probable cause” to ar *1019 rest the defendants.); United States v. Taylor, 471 Fed.Appx. 499, 520 (6th Cir.2012) ("Assuming without deciding that Brady applies to suppression hearings, we nonetheless conclude that the evidence about Agent Lucas was not material to the suppression-hearing proceedings or to the trials held in this case.”); United States v. McCoy, 348 Fed. Appx. 900, 902 (4th Cir.2009) ("Assuming, without deciding” that evidence regarding the legality of a Terry stop was "was both favorable and withheld under Brady, McCoy failed to prove that the new evidence was material.”); United States v. Bullock, 130 Fed.Appx. 706, 723 (6th Cir.2005) (noting the "questionable relevance” of Brady to "whether the suppression hearing might have come out the other way,” but concluding that appellant could not show prejudice); United States v. Johnson, No. 96-2008, 1997 WL 381926 (10th Cir. July 7, 1997) ("[A]ssuming that the evidence identified by Mr. Johnson was in fact withheld by the prosecution and favorable to Mr. Johnson ... we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a Brady violation,” where the evidence would have undermined the officer's credibility during a pretrial suppression hearing where the officer and the defendant disputed whether the defendant had consented to a car search.).

. A split of authority exists on the different but related question whether Brady applies to information that would impeach police officers’ affidavits in support of search warrants. Compare United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993) (concluding "that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant” where the concealed information would have impeached the police officer’s claim that he had probable cause to search the defendant's home), with United States v. Colldey, 899 F.2d 297, 303 (4th Cir. 1990) (declining to extend Brady to the warrant application process so as to avoid "perniciously prolix affidavits that would distract police officers from more important duties and render the magistrate’s determination of probable cause unnecessarily burdensome"). The logistical concerns raised in Colkley are not present in Mr. Biles’s case, which involves disclosure of information relevant to a trial court's pretrial suppression ruling, not a magistrate's probable cause determination at the warrant phase.

. The courts in Smith and Gamez-Orduno ultimately rejected the Brady claims in those cases on grounds that the suppressed information was not "material” to the outcome of the hearing. We discuss materiality infra in Part II. C.

. Some courts have simply noted that, for plain error purposes, the applicability of Brady to Fourth Amendment suppression hearings was not "obvious." See, e.g., United States v. Nelson, 193 Fed.Appx. 47, 50 (2d Cir.2006) (remanding on other grounds and declining to answer "[w]hether Brady and its progeny require disclosures in advance of pre-trial hearings" — "an open question in this circuit"); United States v. Stott, 245 F.3d 890, 902 (7th Cir.2001) (stating that "we cannot say that the law is clear on the question of whether Brady should apply to suppression hearings”); United States v. Bowie, 198 F.3d 905, 912 (D.C.Cir.1999) (stating that "it is hardly clear that the Brady line of Supreme Court cases applies to suppression hearings”). The Bowie court, briefly reflecting on an argument the appellant "faintly” and "obliquely” made in a heading of his reply brief, reasoned in dicta that suppression hearings "do not determine a defendant's guilt or punishment,” and thus presumably would be beyond the scope of Brady. Bowie, 198 F.3d at 912. But the court explicitly made clear that the issue was not briefed and that it was not purporting to formally consider or decide it. Id. For the reasons stated in this opinion, we find this dicta unpersuasive.

. It is worth noting that the Jencks Act, which codified in large part the Supreme Court’s decision in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), setting forth the government’s obligation to disclose prior statements of its witnesses for impeachment purposes, applies at suppression hearings. See 18 U.S.C. § 3500(b) (2006) (requiring prosecutors to disclose any statement of a witness in the possession of the United States that relates to the subject testified to by the witness on direct examination); Fed. R.Crim. Proc. 26.2(g) (extending this requirement to suppression hearings); D.C.Super. Ct. R.Crim. Proc. 26.2(g) (same).

. The police report signed by Officer Davis stated: "Mr. Biles was arrested. Mr. Biles[’s] movies [w]ere stored in a box adjacent to door # 2 on a crate. Mr. Biles was in possession of 156 DVD’s....” And as the trial court noted, the version of events Officer Davis presented at trial was "not at all the way it was posited with respect to the opening [statement] that they just found it incident to the arrest, like it was right there by him....”

. The sheer volume of questions asked by counsel of Officer Davis about the informant indicates the extent to which counsel was distracted by the government’s unexpected midtrial disclosure. Rather than focusing on whether the warrantless search fit into any recognized exception to the warrant requirement, counsel spent considerable time asking, for example, whether the informant was employed by MPD, how Officer Davis knew the informant, what it meant to be the informant's "handler,” how the informant referred to Mr. Biles in the phone call, whether the informant’s past tips had been reliable, whether the informant had a relationship with Mr. Biles, whether Officer Davis knew what the informant did for a living, whether Officer Davis knew the informant's criminal history, whether the informant had any pending criminal cases, whether Officer Davis and the informant had discussed Mr. Biles before the informant called Officer Davis, whether the informant was under the influence of drugs or alcohol when he or she made the phone call, how many of the informant’s eight prior tips were related to the Florida Avenue flea market, how long the informant had been providing MPD with tips, whether the prior tips were accurate, whether the informant got paid for the tip about Mr. Biles, how much the informant ordinarily got paid, whether prior tips had led to arrests, whether prior tips had led to convictions, and whether the informant been paid for a tip that led to an arrest in a separate investigation that Officer Davis had been conducting. Following this lengthy cross-examination, counsel asked the court to order the government to disclose "information on the cases that this individual has worked on before to see if there were convictions” and argued that although Officer Davis had testified that the informant had provided eight tips that led to arrests, ”[t]he fact that they arrested someone based on a confidential tip doesn't prove that tip to have been correct or valid or anything else.”

. At oral argument the question arose, during Mr. Biles's counsel’s argument, whether the government could have "suppressed” evidence for Brady purposes if the defendant himself may have known about it. The Supreme Court has not explicitly addressed and state and federal courts are split on this "due diligence” question. In the District of Columbia, the federal court of appeals has held that because the government is responsible for "any favorable evidence known to the others acting on the government’s behalf,” it is not the defendant's burden to obtain it. In re Sealed Case, 185 F.3d 887, 896 (D.C.Cir.1999) (citation omitted). Here, the government has not suggested that this is a case in which— like the typical "due diligence” scenario— defense counsel failed to look through a file or the defendant refused to answer a specific question by counsel or the court about a favorable witness he knew about. Mr. Biles knew the location of the items, but there is no indication that he was trained in Fourth Amendment jurisprudence. His attorney, on the other hand, is trained in the law but had no reason to know the true basis for the warrantless search. Even if counsel had explicitly asked Mr. Biles why police arrested him and whether officers saw the items in ■question, there is little indication from the Gerstein affidavit or any other evidence in the record that Mr. Biles or his counsel had reason to understand the precise basis for, or timing of, his arrest or the search of the items. Moreover, the question whether the "due diligence” doctrine is consistent with Brady and its progeny is an unresolved and complicated one. See generally Kate Weis-burd, Prosecutors Hide, Defendants Seek The Erosion of Brady Through the Defendant Due Diligence Ride, 60 U.C.L.A. L.Rev. 138 (2012). We decline to address the issue in a case where the government has not briefed it and where the facts make clear that the doctrine would not squarely apply.

. The government agreed at argument that a defendant’s failure to assert ownership of property, while potentially relevant to whether he has abandoned the property and thus retains no reasonable expectation of privacy with respect to it, does not defeat his "standing” to assert a Fourth Amendment claim. See, e.g., Rakas v. Illinois, 439 U.S. 128, 138—39, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (choosing to ”dispens[e] with the rubric of standing” for Fourth Amendment purposes and instead to focus solely on the question whether the movant's personal Fourth Amendment rights were violated, thus allowing any standing issues to be "subsumed” within "substantive Fourth Amendment doctrine”).

. At oral argument the government disclaimed any reliance on the search-incident-to-arrest exception. This is consistent with the trial court's comment on April 11 that "but for that phone call” from the informant the police "wouldn’t have gone to the box” and the trial court’s suggestion that the gov-emment had inaccurately implied "that [the police] just found it incident to the arrest, like it was right there by him.” Indeed, although it is not an issue in this appeal, the record indicates no legal justification for Mr. Biles's warrantless arrest.

. The government does not appear to dispute that the outcomes of both the first and second trials would have been different absent the ability to introduce the items in question.

. The government offered this testimony to prove Mr. Biles's knowledge of the counterfeit nature of the DVDs — an element of the crime. Defense counsel objected, arguing that it “has nothing to do with the knowledge element” and that "[i]f it only goes to knowledge, she only needs to testify to what they were, not where they were, how she found them or any of the other information.” The court ruled that it would "permit this testimony to stand for the purpose that [the government] has suggested.”

.The government’s expert later concluded that the DVDs "were pirated” because they lacked the "true name and address of manu *1026 facturer" and many "were still in the movie theaters at the time of the individual's arrest."

.See supra Part II.B. See also Kritsidimas v. Sheskin, 411 A.2d 370, 373 (D.C.1980) (stating that suppression motions "demand detailed judicial consideration of specific facts” and "often require hearings and findings of fact," which are "the kinds of judicial exercises the 'law of the case’ doctrine is designed to prevent being repeated"); Jenkins v. United States, 284 A.2d 460, 463-64 (D.C.1971) (stating that rulings on pretrial suppression motions constitute the law of the case).

. While we have characterized the Fourth Amendment challenge to the warrantless search as a meritorious claim, our precise holding in that regard — that under Brady, we find a reasonable probability that the delayed disclosure affected the outcome in this case— does not strictly preclude further litigation of the suppression issue on remand.

. Given this resolution, we do not reach Mr. Biles's other claims of error: that the midtrial disclosure of "the distance of the box of DVDs” from Mr. Biles "denied the defense the opportunity to investigate, craft, and pres *1027 ent a more detailed challenge to the government’s constructive possession case,” and that "the government did not establish by clear and convincing evidence that the appellant was actually guilty of deceptive labeling before allowing testimony about his previous arrest into evidence.”