**UNITED STATES of America, Plaintiff,**

v.

**Edmond MALACHI, Defendant.**

**Cr. No. 89–0338.**

United States District Court,
District of Columbia.

Nov. 9, 1989.

John Gidez, Asst. U.S. Atty., Washington, D.C., for plaintiff.

Brenda G. Grantland, Alexandria, Va., for defendant.

## MEMORANDUM

JUNE L. GREEN, District Judge.

This matter is before the Court on defendant Edmond Malachi's Motion to Suppress

Evidence and Statements. Upon consideration of the motion, the government's opposition, evidence presented at a hearing on the motion November 6, 1989, and for the reasons set forth below, the Court grants defendant's motion to suppress all evidence gathered as a consequence of the government's illegal search of the defendant.

## I.  FACTS [1]

On August 25, 1989, four plain-clothes members of the Metropolitan Police Department's Narcotics Interdiction Unit were stationed at their frequent checkpoint, the Greyhound bus terminal at 1005 First Street, N.E., in the District of Columbia. At approximately 1:40 am., Sergeant John Brennan and Detective Edward Hansen observed two young black males alighting from a bus which had just arrived from New York City.[2] These two persons were Edmond Malachi and a juvenile companion, who is not a defendant in this action.

The juvenile, who carried no luggage, stepped down from the bus just ahead of the defendant, who was carrying two tote bags, one blue and one maroon. Once off the bus, Malachi handed the maroon bag to the juvenile and the two proceeded to walk further into the bus terminal together. For unspecified reasons, Officers Brennan and Hansen followed at a distance of about 15 yards.

Investigator William Buss, who was stationed further into the terminal, first observed the defendant after the suspects had walked a third of the way through the building. The investigator's attention was drawn to the suspects because of the officers following them. At this point Buss had no knowledge of the suspects except that they were being pursued by his colleagues. He, too, began to walk behind the suspects.

In the course of traversing the terminal towards an exit, the defendant and the juvenile separated for a few moments, as the defendant stopped near a men's room and the juvenile approached a nearby Hardie's counter. The juvenile then turned and rejoined the defendant, and they proceeded to and through the First Street exit of the terminal. They did not appear to speak during their time in the terminal, which lasted no more than 30 seconds.

About 15 yards outside the terminal, Officer Buss approached the defendant from his side, held out police identification, stated that he was a police officer and asked if the defendant would mind answering a few questions. At the same time, Detective Hansen approached the juvenile in a similar manner. Both suspects stopped at the requests without hesitation. Sergeant Brennan and Officer Curley, acting as "backup," stood about 15 feet away from the two interview pairs, which were only one or two feet apart.

Buss asked the defendant if he had just gotten off a bus. Malachi replied "yes." Buss asked where Malachi had come from. Malachi said "Baltimore." Buss requested the defendant's ticket. The ticket Malachi produced in response indicated a fare from New York City to Washington, D.C. Buss inquired where Malachi was going. The suspect said, "the hotel." Buss asked "which hotel." Malachi responded, "I'm going to meet some friends there." At this point, Buss claims, Malachi began to "stutter" and seemed nervous. Buss pressed on, "which hotel." Malachi replied, "I came here to see my aunt." Buss then further identified himself as being a member of the Narcotic Interdiction Unit and stated that the unit was looking for drugs entering the city. Meanwhile, Buss noticed that the juvenile had put down his tote bag and walked back into the terminal. One of the back-up officers yelled to Detective Hansen, "your man's getting away," and

---

1. At the hearing on defendant's motion, three police officers testified in support of the government's opposition to defendant's motion. The facts which follow reflect the Court's distillation of their combined testimony.

2. Neither officer's testimony indicated when they learned that this bus was from New York. However, since no evidence rebutted the implication that they knew this when they observed the defendant exiting the bus, the Court will assume that fact for present purposes.

Hansen walked into the terminal after the younger suspect.[3]

Buss then asked the defendant if he had any drugs or weapons with him. Malachi said "no." Buss next inquired if Malachi had "any problem" with the officer searching the blue tote bag. Malachi did not answer, but merely handed the bag to Buss, who set it on the ground. Buss asked again, "are you sure you have no problem?" and Malachi said simply, "go ahead." Buss knelt down on the ground, searched the blue tote bag, and found nothing. As Buss was doing so, Brennan moved closer and stood about a foot or two from Buss, who still was directly in front of Malachi.

Following the unsuccessful search of the bag, Buss asked Malachi if he had "any problem" with the officer searching Malachi's person. Malachi replied "yes." The officer asked why this was so, and the defendant answered that he was "against drugs." Hearing this refusal of a body search, Brennan said, "Billy [i.e., Officer Buss], there's a bulge in his crotch." Both officers claim to have noticed a "bulge" the size of either a golf ball (according to Brennan) or a baseball (according to Buss) in the defendant's "crotch."[4] Buss stated that he had not noticed the bulge up to that point in the encounter because his attention was focused on the defendant's eyes.

Buss proceeded to "pat-down" the area of the bulge. He assigned as his reason for the frisk a need to check for a gun.[5] He told the Court that as soon as he felt the "rocky" contour of the bulge he "knew" it was not a gun; he had felt this substance many times before, and it had "always" turned out to be "crack" cocaine. When Buss made this determination, Bren-

nan and Curley surrounded the defendant and Brennan opened Malachi's pants and removed a package which contained a substance the police later determined to be cocaine base. Buss informed Malachi that he was under arrest. A subsequent search of Malachi's pants pockets revealed 21 additional vials of cocaine base, and a search of the maroon bag yielded two bags of cocaine. All of these substances are reflected in the charge brought by the government.

## II. DISCUSSION

The government bears the burden of establishing the reasonableness of any search it performs in the absence of a search warrant. *Rouse v. United States*, 359 F.2d 1014, 1016 (D.C.Cir.1966). In this case, the government offers two possible justifications for the search of defendant's body. The first is that the intrusion was a mere pat-down tailored to the narrow purpose of detecting weapons, and therefore permissible in the course of an investigative encounter upon a showing of specific and articulable reasons to fear reasonably that the suspect may conceal a weapon. *See Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). The second basis is that the officer had probable cause to believe the defendant was engaged in criminal activity at the time of the search, and therefore a search for weapons and destructible evidence incident to a lawful arrest is warranted. *Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969). The Court will consider these theories in reverse order, so as to narrow the focus to the level of justification which actually existed.

---

**3.** Hansen explained that in the course of questioning the juvenile, the detective asked for a bus ticket. The juvenile responded, "I'll go get it," dropped the maroon tote bag where he had stood, and walked into the terminal. The detective followed the juvenile and found him a short time later kneeling on the floor in the bus (apparently the bus on which the suspects had arrived).

**4.** While the government pleadings and testimony identified the area of the bulge as "the crotch," demonstrations by both officers located

the bulge in the area of the left-hand pants pocket, an inch or two below the waistband.

**5.** Officer Buss acknowledged at the hearing that he had never recovered a gun from a suspect's crotch in his 15 years on the force. Sergeant Brennan claimed to have recovered many guns from that location in the past. Both acknowledged that the bulge did not look much like a gun, but that they could not be certain of that without checking.

## A. Probable Cause

A warrantless arrest is lawful if it is supported by probable cause; that is, a reasonable belief by the arresting officer that criminal activity has occurred or is occurring, and that the arrested person is the guilty party. *See Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). *See also Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969). Such an arrest gives rise to a valid search for weapons or destructible evidence. *Chimel*, 395 U.S. at 762–63, 89 S.Ct. at 2039–40. However, it is "axiomatic" that an incident search may not precede the development of probable cause and serve as part of its justification. *Sibron v. New York*, 392 U.S. 40, 62–63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968).

█ In its pleadings and argument, the government pointed to several factors as a basis for probable cause: the officers testified that the bus station is a major import location for narcotics; the defendants exchanged a bag and separated briefly during their walk through the station; the defendant "seemed nervous," "stuttered" and gave "inconsistent" answers; the juvenile abruptly left the scene of the questioning; the defendant allowed a search of the blue tote bag, but "became defensive" upon a request to search his person;[6] and a "bulge" was visible in defendant's "crotch."

The Court finds this argument thoroughly unpersuasive. For nearly every "suspicious" element of this scenario, there is a plausible explanation. When they first spotted the suspects, the officers knew nothing more than that these were two young black males exiting a bus from New York.[7] Handing a bag to a friend to carry after exiting a bus is also insignificant. The fact that the two did not talk, and that they were not perfectly lucid upon questioning,[8] is not surprising in view of the fact that only one minute earlier they had completed a potentially lengthy bus trip at 1:40 in the morning. Stopping near a restroom or deliberating on a food purchase en route to an exit is similarly unremarkable.

As to the actions of the juvenile, the Court finds little to impute guilt to Malachi. Detective Hansen stated that the juvenile walked away[9] in a declared effort to retrieve the bus ticket requested by the officer. While the back-up officers may not have realized this fact, causing one of them to warn Hansen that "his man" was "getting away," Buss was only a foot or two away and well may have heard the reason for the departure. Moreover, if the juvenile and Malachi, at that point in the interviews, in fact were free to leave (as the government asserted in its brief, Opposition at 4), then the juvenile's departure could not bolster a finding of Malachi's probable guilt.

Malachi's refusal to submit to a body search, after consenting to a search of the tote bag, does not suggest anything more than a desire to be free of further intrusion. To suggest otherwise would mean that all innocent persons must submit to body searches to avoid arousing the suspicion of law enforcement officers, in disregard of the underlying premises of the Fourth Amendment.[10]

---

6. Government's Opposition to Defendant's Motion ("Opposition") at 6.

7. Officer Buss was not aware of the bus' place of origin when he began his questioning of Malachi.

8. Buss admitted knowing that Baltimore is a stop for buses travelling from New York to D.C. In fact, it is conceivable that a passenger might interrupt such a trip with a short stay in Baltimore, completing the trip on a later bus.

   As to the other answers, they are not necessarily inconsistent standing alone. Buss perceived that Malachi's manner of responding was evasive, but could refer only to a purported stutter to illustrate a nervous demeanor. Considering the inherent potential for intimidation where a white, 6'2", 15 year police veteran questions an 18 year old black, 5'7" male at a quarter to two in the morning, this demeanor was probably not exceptional.

9. The government's brief asserted that the juvenile "dropped a maroon bag to the ground and ran." Opposition at 2. No testimony supported this statement.

10. The Supreme Court recognized the body frisk as "a serious intrusion upon the sanctity of the person, which may inflict great indignity and

Finally, the bulge allegedly visible in Malachi's pants is a vague and inadequate basis for this search. The disparity in the officers' descriptions of the size and location of the bulge, Buss' failure to detect it until Brennan pointed it out, Buss' admission that it did not resemble a weapon and that this was not a typical location for a gun, and the timing of its discovery leave the Court without confidence in the reliability of this factor.

### B. The *Terry* Frisk

■ While the government seemed at the hearing to abandon argument of a valid *Terry* stop, the Court will examine this justification as well. A valid *Terry* frisk requires a finding that adequate reasons for suspecting criminal activity were established before the frisk, and that the frisk was in response to a reasonable apprehension of danger to the officers. *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884. Based on the findings set forth above, these predicates were not satisfied.

■ The same factors which failed the probable cause analysis fail the lower level *Terry* inquiry. None of the facts noted by the officers prior to the stop made these suspects particularly worthy of scrutiny. *See Reid v. Georgia*, 448 U.S. 438, 440–441, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980) (finding defendant described in similar terms to be consistent with "a very large category of presumably innocent travelers"). The first factor of any merit is the claim of a suspicious bulge, which the Court finds unreliable in the total context. Furthermore, many passengers with light luggage on a common carrier might have pockets full of belongings upon arrival at their destination. Without prelimi-

nary indicia of criminal activity, a nondescript bulge does not fuel suspicion of dangerousness. *Compare United States v. Hill*, 545 F.2d 1191, 1192–93 (9th Cir.1976) (report of armed robbery in area, coupled with detection of a bulge in interview subject's clothing, supported *Terry* frisk); *United States v. Gidley*, 527 F.2d 1345, 1347–48 (5th Cir.) (prior report of crime, description matching suspect, and sighting of a bulge, together supported frisk), *cert. denied*, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976); *United States v. Lindsey*, 451 F.2d 701, 702–03 (3d Cir.1971) (indicia of "extreme anxiety" and suspect's presenting multiple identifications to officer, in addition to bulge, supported frisk), *cert. denied*, 405 U.S. 995, 92 S.Ct. 1270, 31 L.Ed.2d 463 (1972). As a result, Buss performed the frisk with scant reason for even an investigative interview, and without enough justification for the seizure which arose when he announced himself as an interdiction officer and stated that he wanted to search Malachi's belongings and person.[11]

■■ Even if the bulge were used as a justification, the search performed by Buss far exceeded the permissible scope of a *Terry* frisk. Such searches should be limited to the exterior of a suspect's clothing unless evidence of a weapon is detected. *See id.*, 392 U.S. at 30, 88 S.Ct. at 1884. Buss stated unequivocally that as soon as he felt the contour of the bulge he knew it was not a weapon. His only purpose in searching further was to recover what he expected would be crack cocaine.[12] While this is a permissible function of a search incident to an arrest, it is unacceptable in the *Terry* context. *United States v. Robinson*, 471 F.2d 1082, 1089–90 (D.C.Cir.

arouse strong resentment, and [which] is not to be undertaken lightly." *Terry*, 392 U.S. at 17, 88 S.Ct. at 1877 (citation omitted).

11. A finding that a seizure occurred at this point in time is also supported by the remark, in the defendant's presence, that Hansen's "man" (the juvenile) was "getting away." Such a statement surely would inform a person that he was not free to leave. *See United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), *cited in Florida v. Royer*, 460

U.S. 491, 498–99, 103 S.Ct. 1319, 1324–25, 75 L.Ed.2d 229 (1983).

12. The Court does not suggest that police ignore potential evidence when they discover it inadvertently. However, if Buss had performed a lawful frisk, he then might have relied upon the added indicia of guilt which the pat-down produced in order to justify a longer stop, allowing additional questioning, the summoning of a "sniffing" police dog, or the acquisition of a telephone warrant.

1972) (*en banc*), *reversed on other grounds,* 414 U.S. 218, 94 S.Ct. 494, 38 L.Ed.2d 427 (1973); *Tinney v. Wilson,* 408 F.2d 912, 915–16 (9th Cir.1969); *see also United States v. Short,* 570 F.2d 1051, 1055–56 (D.C.Cir.1978). *Cf. United States v. Foster,* 584 F.2d 997 (D.C.Cir.) (in context of full arrest, search of closed bag allowed only because of subjective fear that it contained a weapon), *cert. denied* 439 U.S. 1006, 99 S.Ct. 620, 58 L.Ed.2d 682 (1978).

## C. Abandonment

Because the Court finds that the search of defendant's pants was not legally justified, all evidence [13] seized as the fruit of that search and arrest must be suppressed. *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963). The government argues, however, that even if the evidence recovered from Malachi's person is suppressed, the drugs found in the maroon tote bag carried by the juvenile are admissible still, since the juvenile "abandoned" the bag. The Court disagrees.

■ Standing to challenge governmental encroachment on Fourth Amendment protections vests in a person who has a "legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). This interest is examined not only in a subjective light, but also to assess whether the person's expectation is objectively reasonable as "an expectation that society is prepared to honor." *California v. Ciraolo,* 476 U.S. 207, 214, 106 S.Ct. 1809, 1813, 90 L.Ed.2d 210 (1986). Once this expectation is recognized as valid, it will not be presumed abandoned without clear, unequivocal and decisive affirmative evidence of such an intent, the production of which falls to the party asserting abandonment. *Friedman v. United States,* 347 F.2d 697, 704 (8th Cir.), *cert. denied,* 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354 (1965).

■ The Court finds that the government has failed to carry this burden.[14] The officers saw Malachi descend the bus steps in possession of the maroon tote bag, and then hand it to the juvenile. The bag was closed, and the defendant was never more than a few steps from it throughout the encounter. The fact that the juvenile set it down and walked away is inconclusive in light of his stated purpose of retrieving his ticket. Moreover, since the companion was a juvenile, Malachi may have had a greater subjective expectation of control over the bag's custodian, and thus the bag itself. These facts support "a reasonable inference that [Malachi] took normal precautions to maintain his privacy" vis-a-vis the maroon bag, *Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980), *quoted in Ciraolo,* 476 U.S. at 211, 106 S.Ct. at 1811, and the privacy interest of travelers in their luggage is certainly an expectation society is prepared to honor.

The Court wishes to stress that it has considered the totality of the described circumstances in this case, with due deference to the considerable expertise of the police officers involved. Nonetheless, the Court finds that these officers, having begun a lawful investigation which ultimately might have yielded a lawful arrest, impermissibly attempted to "short-cut" the investigative

---

**13.** Defendant's motion addresses any statements made by the defendant subsequent to the search as being subject to suppression. Motion to Suppress at 1. While the government responded that it was unaware of any such statements, Opposition at 6 n. 3, if any are later identified their use is also suppressed by this order.

**14.** At the hearing, counsel for the government maintained that he had inadequate notice that the maroon bag was in issue, and asked for an opportunity to brief that issue and present further evidence. The Court denies this request, finding defendant's reference to "all evidence ... seized from [defendant's] possession," Motion to Suppress at 1, and the specific description the maroon bag and its illegal contents, *id.* at 2, to satisfy pleading and notice requirements. After all, if the defendant did not at least constructively possess the maroon bag, he could not be charged with responsibility for its contents. Furthermore, the government's pleading addressed this issue and relied upon the abandonment theory, negating any claim of surprise or prejudice. Opposition at 6 n. 2.

process and conducted a search supported by little more than an "inchoate and unparticularized suspicion or 'hunch,'" *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. The Fourth Amendment requires more scrupulous government efforts to protect individuals from unjustified intrusions upon their privacy.

### III. CONCLUSION

For the reasons set forth above, the Court grants defendant Edmond Malachi's Motion to Suppress Evidence and Statements.