*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CO-1094

UNITED STATES, APPELLANT,

V.

KHALIL K. POPE, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2016-CF2-011849)

(Hon. Michael O'Keefe, Trial Judge)

(Argued September 29, 2020                                          Decided April 18, 2024)

*Matthew Covert*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the initial brief was filed, *Michael R. Sherwin*, Acting United States Attorney at the time the reply brief was filed, and *Elizabeth Trosman*, *Nicholas Dingeldein*, and *Emma McArthur*, Assistant United States Attorneys, were on the brief, for appellant.

*Shilpa S. Satoskar*, Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the brief, for appellee.

Before DEAHL, *Associate Judge*, and RUIZ and GLICKMAN,[*] *Senior Judges.*

---

[*] Judge Glickman was an Associate Judge of the court at the time of argument. He began his service as a Senior Judge on December 21, 2022.

Ruiz, *Senior Judge*:  The United States appeals the trial court's grant of a motion to suppress physical evidence, in this case a firearm.  First, the government contends that the trial court erred as a matter of law by finding that appellee, Khalil K. Pope, was seized within the meaning of the Fourth Amendment when he was pursued by police.  This led the trial court to conclude that because the police had no reasonable articulable suspicion to stop Mr. Pope, the backpack the officers seized when they caught up with him was the fruit of an illegal seizure.  Second, the government argues that Mr. Pope abandoned his backpack and, therefore, he had no reasonable expectation of privacy in the backpack and no standing to challenge its search and seizure of the gun found inside.  We agree with the government's first contention that the trial court erred in concluding that the officers' mere pursuit constituted a seizure.  We disagree with the second contention, and affirm the court's suppression of the firearm on the alternative ground that, as a matter of law, the government did not bear its burden of proving that Mr. Pope had abandoned the backpack when the officers, without probable cause or a warrant, retrieved it from where appellant had hidden it in an out-of-the-way area of a private home with which he had a personal connection.

## I.    Factual Background

Mr. Pope was charged with Carrying a Pistol without a License (Outside Home or Business); Possession of an Unregistered Firearm; and Unlawful Possession of Ammunition in violation of D.C. Code §§ 22-4504(a); 7-2502.01(a); and 7-2506.01(3).  He filed a motion to suppress the gun, and the trial court held a hearing at which the following facts were presented.

On July 26, 2016, Metropolitan Police Department ("MPD") Officers Di Lauri, Hildebrandt, and Van Hook were patrolling Riggs Road NE in the District of Columbia near the Maryland border.  At approximately 6:28 p.m., the officers received a radio call from the Prince George's County Police Department requesting assistance locating "a male supposedly armed with a gun" who had "just crossed over" from Maryland into D.C. near the 5800 block of Eastern Avenue.  The MPD officers tried to obtain more information, asking PG County, "what's the lookout?"  PG County replied: "[a]ll I know at this point is that it's a black male."  The MPD officers began to drive their patrol car toward Eastern Avenue.

About five minutes later, PG County police radioed MPD additional details, saying that they had initially responded to a call for "[a] man with a gun" who was described as a "heavyset black male, wearing black clothing."  PG County explained

that their officers "did not see a weapon," but that "the individual gave flight when approached by officers."

While the MPD patrol car was still about two blocks away from Eastern Avenue, Officer Van Hook saw Mr. Pope, who "matched [the] lookout" from the radio call. Van Hook described Mr. Pope as a "heavyset black male" with "a black tee shirt around his neck" who was "sweating profusely." According to Van Hook, Mr. Pope was entering the "south alley of the 400-block of Riggs Road, Northeast, coming from Nicholson Street, Northeast." The officers turned their vehicle onto Nicholson Street "to begin to make contact with [Mr. Pope]," but as soon as Mr. Pope saw the marked MPD cruiser, he "looked directly at" the MPD officers and "began to flee."

The officers chased Mr. Pope down the alley. Van Hook and Hildebrandt said Mr. Pope ran into the backyard of 459 Riggs Road NE, entered the back door of the home, and shut it behind him. The three officers ran to the door Mr. Pope had entered. Finding it locked, Di Lauri knocked, and a "couple seconds later," a woman opened the door. Van Hook said that the woman "appeared very nervous or frantic, scared." Van Hook did not remember whether the woman gave permission to enter

the house, only that she "moved out of the way" as she was opening the door and said something to the effect of "[h]e's going downstairs."[1]

Upon entering the house, Van Hook could not immediately see Mr. Pope, but after he turned a corner into the kitchen, he could see Mr. Pope's head as he "r[an] down the stairs towards the basement." As the officers went down the stairs after Mr. Pope, they saw Mr. Pope "toss[]" a backpack into a back room in the basement. Di Lauri handcuffed Mr. Pope, and Van Hook entered the back room to search for the backpack. On cross examination, Van Hook agreed that on his bodyworn camera footage from that day, he may have said that Mr. Pope had "stashed" the backpack, not simply "tossed" it. Van Hook explained that the statements were not inconsistent, because he recognized that Mr. Pope was attempting to hide the backpack, stating that "if you toss something into an area and attempt to hide it, you're tossing it to stash it."

---

[1] In its written memorandum opinion, the trial court noted that there was "conflicting testimony regarding whether and to what extent the homeowner gave explicit or implicit permission to the officers to enter and search the home." However, the trial court declined to resolve the conflict, stating that because the officers had already unlawfully seized Mr. Pope (by pursuing him without lawful justification), "any issues relating to consent are irrelevant for purposes of this [o]pinion." Our disposition of this case on the issue of abandonment of the backpack also is distinct from the question whether Mr. Pope can challenge the officers' entry into the house. *See* note 13 *infra*.

According to Van Hook, "[l]ess than a minute" elapsed between the time that Di Lauri directed him to search the room for the backpack and when he located it. He said that he found the backpack "sitting kind of on the ground, against the wall" and that it was "somewhat under the staircase" and nothing was on top of it. He picked it up and squeezed the bottom because it felt heavy enough to contain a firearm. He felt the "mold" of a gun handle, looked inside the bag, and confirmed his suspicion that it held a gun. When defense counsel asked why four to five minutes elapsed between the time that the officers radioed that they had secured Mr. Pope and when they radioed that they had found a weapon, Van Hook said that radioing about the gun recovery was "not instant" and that he was not sure exactly how long he helped Di Lauri secure Mr. Pope before he went to search for the backpack.

Mr. Pope's version was somewhat different. He testified that he double-locked the rear door to the house after he entered, went through the kitchen, and ran down the basement stairs, closing two additional doors behind him. Once he was in the basement, he went into the laundry room in the back and to a space underneath the stairs used for storage ("crates, containers, an old TV, [and] a couple of monitors"). He placed his backpack in the bottom of a plastic storage crate of his belongings that he kept in the house, underneath his "cousin Rob['s]" crate, and then covered the backpack with clothing from the crate and placed Rob's heavier crate

back on top. He said that by the time the police officers opened the door at the top of the staircase, he was already walking back from the laundry room, and that when they got to the bottom of the stairs, he was sitting down. The officers then asked him where his backpack was. After Mr. Pope denied having had a backpack, one of the officers handcuffed him, and then both officers went into the laundry room and searched "for at least a good three minutes" before they found the backpack.

In its findings of fact, the trial court noted the "direct conflict" between the testimony of the MPD officer and Mr. Pope concerning the exact timing of the search for the bag and where it was found. The trial court explicitly declined to resolve the factual differences, stating that: "[i]rrespective of the precise moment when the officers ultimately stopped Mr. Pope, [Officer] Van Hook located a drawstring bag, which he picked up and felt what he recognized as the shape of a gun."[2] The trial court did, however, find that Mr. Pope intended to hide the gun, noting that he "hides the bag, stashes the bag." The court stated that the semantics about precisely how Mr. Pope disposed of his backpack did not matter because "ultimately he hid the

---

[2] There was no independent corroboration of the officers' testimony, because they did not turn on their bodyworn cameras until after they had found and searched the bag and arrested Mr. Pope. The officers conceded that this contravened police regulations, which required them to activate their cameras once they began to chase Mr. Pope.

gun. [Mr. Pope] was trying to hide the gun. Whether he shoved it, whether he dropped it, whether he placed it, whether he stuck it in the bin."

The trial court also heard testimony about Mr. Pope's relationship to the Riggs Road house. After Mr. Pope was arrested, Van Hook asked him "do you live here or do you stay somewhere else?" Mr. Pope responded that he "stay[ed] somewhere else" and gave Van Hook an address in Laurel, Maryland. At the suppression hearing, however, Mr. Pope explained that he actually did live at the Riggs Road house two to three nights a week, but that he initially told the officers he did not live there to avoid Section Eight housing repercussions for the home's tenant, whom he had known since he was 13 years-old and referred to as his "Aunt Sheila" even though they were not actually related to each other. He referred to her son as "Cousin Rob."

After Mr. Pope was arrested in the basement, Di Lauri went upstairs to ask those present in the house who Mr. Pope is to them. Sheila responded that Mr. Pope was "just a friend[,] [h]e be around here with my son." Sheila also said that Mr. Pope "ran into [her] house" and that he "hadn't been there in a minute." Sheila's son Rob, said he had told Mr. Pope "not to come around here no more." At the suppression hearing, defense counsel pointed out that after Rob said he told Mr. Pope to stay away, Rob added "I should have kept it like that," implying, as defense

counsel argued, that "whatever ban Rob thought that he had verbally placed . . . Rob lifted it or did not enforce it."[3] The trial court did not make findings about the nature and extent of Mr. Pope's relationship to the home and its residents.[4]

The trial court delivered an oral summary of its ruling on the suppression motion. It noted that the suppression issue was "more complicated" than it initially seemed, and that since the hearing, it had "spent a lot of time listening to the motions hearing and reviewing the body worn camera and the various tapes."

In its oral ruling, the trial court found that "the initial stop of Mr. Pope unconstitutionally infringed his Fourth Amendment right to be free from unreasonable searches and seizures" because the record did not show the officers had a reasonable suspicion of criminal activity to justify a Fourth Amendment seizure.[5] The court granted the motion to suppress, explicitly noting that it was

---

[3] Sheila and Rob's full names do not appear on the record and we refer to them by their first names, as do the parties' briefs.

[4] The trial court questioned the credibility of Mr. Pope's testimony regarding his status at the Riggs Road house, noting that there were "multiple admissions that he didn't live there; right? He said he didn't live there." The trial court also questioned Mr. Pope's testimony at the hearing saying that he lived there part of the week, noting, "it's like his version versus actual people that have an interest in that house on tape, saying opposite of what he's saying." The trial court expressly stopped short of making credibility determinations because it deemed them irrelevant to the court's basis for deciding the suppression motion.

[5] Specifically, the trial court found that the initial "lookout" description from PG County police of a "black male" "supposedly armed with a gun" was simply too

deciding the case only on the basis of the unconstitutional seizure of Mr. Pope, concluding that it need not "get into credibility," nor "the search and the consent and whether or not there was a reasonable expectation of privacy in a bag or in a crate or who was telling the truth."

The trial court supplemented its oral ruling with a written memorandum opinion. The written opinion noted the conflicting testimony at the suppression hearing about whether the Riggs Road tenant consented to the MPD officers' entry to her house but did not make any factual findings in that respect. The trial court also declined to make findings about where or when the MPD officers located the backpack or whether Mr. Pope had standing to challenge the officers' search of the house. The opinion reiterated that because the police lacked reasonable suspicion or probable cause, their pursuit of Mr. Pope was an unconstitutional seizure, and any evidence recovered as a result was fruit of the poisonous tree and therefore inadmissible.

---

generic to rise to the level of reasonable suspicion necessary to justify an investigatory stop of Mr. Pope. The trial court also noted that even though they later added that the individual was "heavyset" and "wearing all black," it was not clear from the record whether the additional description was from the initial lookout, or whether the new details referred to their having approached a black man who happened to be heavyset and wearing all black, who then ran from police.

The government filed a motion for reconsideration of the court's oral and written rulings on November 15, 2019, which the trial court denied. This government appeal followed.

## II. Discussion

"In analyzing a ruling by the trial court on a motion to suppress evidence, we review findings of fact for clear error, while reviewing conclusions of law *de novo*." *United States v. White*, 689 A.2d 535, 537 (D.C. 1997). We must reverse any "[l]egal conclusions that are contrary to existing law." *Id.* at 537-38.

### A. There was no Fourth Amendment Seizure Until Mr. Pope was Physically Stopped by Police.

The government contends, and Mr. Pope does not dispute, that the trial court erred by finding that Mr. Pope was "seized" within the meaning of the Fourth Amendment when he was pursued by the police officers after he ran away upon seeing them. We agree that the officers' pursuit of Mr. Pope did not constitute a seizure within the meaning of the Fourth Amendment and suppression of the backpack as its unlawful fruit cannot be sustained.

"The Fourth Amendment of the Constitution protects individuals from unreasonable seizures by governmental authorities." *Plummer v. United States*, 983 A.2d 323, 330 (D.C. 2009) (quoting *Jackson v. United States*, 805 A.2d 979, 983

(D.C. 2002)).  To be reasonable, a seizure generally must be supported by probable cause or reasonable suspicion.  *Jackson*, 805 A.2d at 983.  A Fourth Amendment seizure occurs "when [a police] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

It is well established that police pursuit alone is not a seizure.  *California v. Hodari D.*, 499 U.S. 621, 626 (1991).  An individual is seized only when an officer uses physical force or a show of force to "terminate[] or restrain[]" that individual's freedom of movement.  *Plummer*, 983 A.2d at 331 (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)).  Thus, a police order to stop is not a seizure if the person does not submit to the official command.  *Hodari D.*, 499 U.S. at 629; *Allison v. United States*, 623 A.2d 590, 592 (D.C. 1993).  Conversely, "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."  *Torres v. Madrid*, 592 U.S. 306, 325 (2021).

"[E]vidence collected in violation of the Fourth Amendment is considered 'fruit of the poisonous tree' and generally may not be used by the government to prove a defendant's guilt."  *Hooks v. United States*, 208 A.3d 741, 750 (D.C. 2019) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).  To decide whether

evidence is fruit of the poisonous tree, the "critical inquiry is whether 'the evidence . . . has been come at by exploitation of th[e] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Jones v. United States*, 168 A.3d 703, 721 (D.C. 2017) (alterations in original) (quoting *Wong Sun*, 371 U.S. at 488).

In this case, the trial court found that Mr. Pope was seized for Fourth Amendment purposes when MPD officers chased him. The court explained that PG County and MPD police were required to have at least a reasonable suspicion that Mr. Pope was engaged in criminal activity, and the information the officers had failed to meet that standard. At the hearing, the government sought clarification by asking if the court was "holding that the officers needed [reasonable articulable suspicion] to chase Mr. Pope?" The court responded affirmatively and then found that because the pursuit of Mr. Pope was not justified by reasonable articulable suspicion, any evidence discovered at the endpoint of the pursuit at the home on Riggs Road was the fruit of an illegal seizure and must be suppressed.

This conclusion was legally erroneous and cannot sustain the court's suppression of the gun found in the backpack as fruit of an illegal seizure. In this case, there is no argument that Mr. Pope was seized before he was arrested in the basement of the Riggs Road home when he was brought under the police officers'

control, which "terminat[ed] . . . his freedom of movement."  *See Plummer*, 983 A.2d at 331 (quoting *Brendlin*, 551 U.S. at 254).

Although the trial court's reasoning was legally incorrect, we do not reverse the trial court's judgment granting the motion to suppress.  "'[I]t is well settled that an appellate court may affirm a decision for reasons other than those given by the trial court,' provided there is a sufficient evidentiary basis and no procedural unfairness to the parties."  *Tuckson v. United States*, 77 A.3d 357, 360-61 (D.C. 2013) (quoting *Purce v. United States*, 482 A.2d 772, 775 n.6 (D.C. 1984)).  We turn to appellee's alternative argument for sustaining the trial court's ruling, that the officers unlawfully seized and searched his backpack.

## B. The Government did not Prove That Mr. Pope Abandoned his Backpack.

Mr. Pope argues that this court should uphold the trial court's ruling suppressing the gun on the alternative ground that the search of the backpack, which yielded the gun, violated his Fourth Amendment rights.  The government concedes that the officers did not have a warrant and otherwise lacked justification for searching the backpack.  What the government contends is that by taking off the backpack and hiding it in Sheila's basement, Mr. Pope abandoned it, relinquishing any expectation of privacy protected by the Fourth Amendment.  We conclude that

the government failed to shoulder its burden to prove that Mr. Pope abandoned the backpack, and on that ground, we affirm the trial court's order suppressing the gun found in the course of a search of the backpack without a warrant or other justification.[6]

The Fourth Amendment protects against unreasonable searches. U.S. Const. amend. IV. "Government conduct is a 'search' within the meaning of the Fourth Amendment if it invades 'an actual (subjective) expectation of privacy'" and that expectation of privacy is one "that society is prepared to recognize as reasonable." *Jones v. United States*, 168 A.3d 703, 711 (D.C. 2017) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). But such an

---

[6] Because the police undisputedly seized Mr. Pope when he was handcuffed in the basement *before* they searched his backpack, discovery of the gun in the course of the warrantless search of the backpack arguably flowed from that seizure. The government halfheartedly argues in a footnote in its brief that the officers were justified in seizing Mr. Pope in the basement before the gun was found. We need not decide this because even if the officers had enough suspicion to justify a brief investigatory *Terry* stop of Mr. Pope—they asked him "where is the bag?"—it would not have justified the search of a closed backpack some ten feet away, beyond his reach. *See Terry*, 392 U.S. at 30 (holding that only a "carefully limited search of the outer clothing" is justified out of concern for officer safety); *cf. Stanley v. United States*, 6 A.3d 270, 275-78 (D.C. 2010) (shaking of belt on suspect where gun might be hidden that could be used against officer deemed reasonable *Terry* frisk). The government does not contend that the officers had independent probable cause to seize and search the backpack.

interest can be abandoned, and by doing so, an individual loses the protection of the Fourth Amendment.

In the context of the Fourth Amendment, "[t]he issue is not abandonment in the strict property-right sense, but whether the person . . . relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *United States v. Scott*, 987 A.2d 1180, 1190 (D.C. 2010) (quoting *United States v. Boswell*, 347 A.2d 270, 274 (D.C. 1975)). Therefore, the question is whether the person's "expectation, manifest in his actions . . . , was that the items would remain private," or whether the person's actions evinced an intention to "relinquish[] his expectation of privacy." *Biles v. United States*, 101 A.3d 1012, 1024 (D.C. 2014). The expectation of privacy must be "one that society is prepared to recognize as 'reasonable,'" *id*. at 1024-25 (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)), and "is determined on the basis of the objective facts available to the investigating officers," *United States v. Nowak*, 825 F.3d 946, 948 (8th Cir. 2016) (quoting *United States v. James*, 534 F.3d 868, 873 (8th Cir. 2008)).

The parties agree, as this court has previously held, that where the government disputes that a person has "standing" to mount a Fourth Amendment challenge on the ground that the person's actions have caused the loss of a protected privacy

interest, the government bears the burden of proving abandonment of such interest by "clear, unequivocal and decisive evidence." *Boswell*, 347 A.2d at 274 (quoting *Peyton v. United States*, 275 A.2d 229, 230 (D.C. 1971)); *United States v. Kyle*, 268 A.3d 1256, 1259 (D.C. 2022) (applying the heightened proof standard).[7] We conclude that on this record the government did not meet its burden of proving that Mr. Pope abandoned his backpack.[8]

---

[7] Not all courts apply the same standard to the government's burden of proof. *Compare Linscomb v. Goodyear Tire & Rubber Co.*, 199 F.2d 431, 435 (8th Cir. 1952) (adopting "clear, unequivocal, and decisive standard"), *United States v. Malachi*, 728 F. Supp. 777, 783 (D.D.C. 1989) (finding that government failed to prove abandonment by "clear, unequivocal and decisive affirmative evidence of such an intent"), *K.W. v. State*, 183 So. 3d 1123, 1129 (Fla. Dist. Ct. App. 2015) (same), *and United States v. Harrison*, 689 F.3d 301, 307 (3d Cir. 2012) (requiring "clear and unequivocal" evidence of intent to abandon), *with State v. Rynhart*, 125 P.3d 938, 943 (Utah 2005) (rejecting the "clear, unequivocal and decisive" standard in favor of preponderance of the evidence), *and State v. Dixon*, 947 N.W.2d 563, 572 (Neb. 2020) (same).

The Supreme Court has stated that the burden of proof in suppression hearings should generally be no greater than preponderance of the evidence, while recognizing that in some cases—an independent source for a tainted in-court identification—it has required a higher standard because the determination involves "speculative elements." *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984) (citing *United States v. Wade*, 388 U.S. 218, 240 (1967). The Court has not specifically addressed the proper standard to prove abandonment of a privacy interest under the Fourth Amendment.

[8] *Boswell* framed the issue of abandonment as affecting standing to mount a Fourth Amendment challenge, and the government's brief on appeal also uses that term to denote the legal consequence of Mr. Pope's alleged abandonment of the backpack. The Supreme Court has "dispense[d] with the rubric of standing" for Fourth Amendment purposes, a matter "subsumed" within "substantive Fourth

With respect to the first, subjective prong, the evidence does not support that Mr. Pope's actions evinced an intention to "relinquish[] his expectation of privacy." The record supports the contrary conclusion. Officer Van Hook first testified that Mr. Pope "tossed" the backpack in the back room in the basement, possibly implying that his purpose was not to hide the backpack, but simply to be rid of it. However, during cross examination, Van Hook acknowledged that by referring to Mr. Pope "tossing" or "stash[ing]" the bag he meant that Mr. Pope was trying to "hide" it. The trial court also noted Mr. Pope's testimony that he took steps to secrete the backpack, finding that "ultimately [Mr. Pope] hid the gun. He was trying to hide the gun." Hiding an object is the quintessential attempt to protect its privacy, by making it difficult for others to see it or take possession of it. That was our conclusion in *Biles*, where we held the act of placing a knapsack over a box of counterfeit DVDs, while staying nearby, was sufficient to show an intent to keep them private, even in an open-air, public market. 101 A.3d at 1024. *Biles* quoted the Supreme Court's opinion in *Katz v. United States*, for the proposition that

> [T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as

---

Amendment doctrine," i.e., whether the movant's personal Fourth Amendment rights were violated. *Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978) (quoted in *Biles*, 101 A.3d at 1023 n.11)).

> private, even in an area accessible to the public, may be constitutionally protected.

389 U.S. at 351 (citations omitted). Similarly, in *Boswell* we held that a defendant's actions showed that he maintained a reasonable expectation of privacy in an item he tried to keep hidden from prying eyes even in a public area. 347 A.2d at 274 (Boswell covered a large television with a blanket, carried it down a public street and left it in the common hallway of an apartment building while he went next door). In this case, Mr. Pope's actions clearly evince his intention to maintain his expectation of privacy more patently than those in *Biles* and *Boswell* because he hid his closed backpack in a storage area in a private home.[9]

At the suppression hearing and in its brief, the government placed great weight on the fact that Mr. Pope was fleeing from police when he hid the backpack. The government cites no case, and we are not aware of any, holding that the mere fact of

---

[9] The officer's testimony and Mr. Pope's differed on details about the exact location of the backpack and how long it took Officer Van Hook to find it. But all the testimony is in agreement that Mr. Pope secreted his backpack in a small room off the basement in a private home. Mr. Pope testified that he placed other items on top of the backpack inside a plastic crate and stacked another crate on top, in a storage area underneath the stairs. The officer testified that the backpack was found in the storage area under the stairs, but that it was lying against the wall, with nothing placed on top of it. Mr. Pope said the officer searched for "a good three minutes" before finding the backpack; Officer Van Hook said it took "[l]ess than a minute." Defense counsel argued that finding the backpack took longer than the officers said because five minutes elapsed from the time they reported finding Mr. Pope in the basement to the time they reported finding the gun. As noted, the trial court found it unnecessary to resolve the conflicting testimony.

flight from police while carrying an object renders an expectation of privacy in that object unreasonable. It is a weak argument as abandonment will be found "only if from all the circumstances, an intent to abandon is reasonably inferable." *Boswell*, 347 A.2d at 274. The circumstances surrounding Mr. Pope's flight point in the opposite direction.[10] If Mr. Pope had intended to rid himself of the backpack, he could easily have tossed it in the alley or yard as he ran, or dropped it off somewhere

---

[10] The government cited several federal cases to argue that in situations where suspects flee from police, items thrown or hidden during flight in another's home are deemed abandoned. These cases are not persuasive here because none had the constellation of factors present in this case where Mr. Pope not only took deliberate action to hold onto and hide the backpack but also waited to do so until he arrived at a private place where he had a prior relationship with the house and its occupants. *See, e.g.*, *United States v. Juszczyk*, 844 F.3d 1213, 1214-15 (10th Cir. 2017) (defendant abandoned backpack when, upon seeing police, he threw it onto the roof of a house whose owner, whom he barely knew, testified she had not allowed Jusczyk to use her roof even though he had used backyard to repair his motorcycle); *United States v. Witten*, 649 F. App'x 880, 885 (11th Cir. 2016) (defendant abandoned bag when he "fled from the officers and hid his backpack under the porch of another person's house"); *United States v. Dillard,* 78 F. App'x 505, 510-12 (6th Cir. 2003) (defendant abandoned briefcase when, upon officers' approach, he "threw the briefcase to the ground near the side door of a house he had been visiting" and was "not attempting to secrete" it); *United States v. Figueroa*, No. 96-2065, 1998 WL 1085825, at *4 (1st Cir. Sept. 22, 1998) (defendant abandoned box when "[d]uring the officers' pursuit, he attempted to stash the box in his neighbors' apartment" which just happened to be convenient and there was no evidence that he had previously obtained neighbor's permission to store box in their house); *United States v. Morgan*, 936 F.2d 1561, 1570 (10th Cir. 1991) (defendant abandoned bag when, upon seeing police approach, he "threw" it into "the backyard of someone he knew or was acquainted with" and the backyard "abutted an open field and wooded area" so that bag "would have been plainly visible" to passersby); *United States v. Martin*, 386 F.2d 213, 215 (3d Cir. 1967) (privacy interest in drug packets were abandoned when they were "discarded" or "thrown away" into a dark pantry while defendant was being chased by police inside a house).

else in the house not associated with his person or other personal belongings. Discarding an object and then continuing to run away from it while fleeing police is a common theme in the cases where we have found the defendant abandoned an object and thus relinquished his Fourth Amendment privacy interests in it. *See, e.g.*, *Allison*, 623 A.2d at 591-92 (holding defendant abandoned his gun when he threw it under a bush during a police pursuit); (*Maurice*) *Brown v. United States*, 261 A.2d 834, 835 (D.C. 1970) (holding defendant abandoned his shopping bag when he dropped it on the ground during a police chase); *Kyle*, 268 A.3d at 1259-60 (holding defendant lacked reasonable expectation of privacy when he tossed backpack over fence into backyard of homeowner with whom he had no connection while fleeing from the police). The government's characterization that Mr. Pope discarded the backpack "midflight" is inaccurate. Instead, Mr. Pope held on to his backpack in full view of the pursuing officers, ran into the house, and deliberately hid his backpack in the basement, where he knew his flight would come to an end. Unlike in the cases cited, Mr. Pope's actions clearly evince his intention to maintain a privacy interest in his backpack.

The further question is whether Mr. Pope's expectation of privacy in his backpack and its contents was reasonable under the circumstances. The Supreme Court has stated that in all the "variety of settings" where an individual's privacy is protected by the Fourth Amendment, "[i]n none is the zone of privacy more clearly

defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton v. New York*, 445 U.S. 573, 589 (1980). This was a private home and the backpack was hidden in an out-of-the way place, in a back room in the basement. The government argues that even so, Mr. Pope's expectation of privacy was objectively unreasonable because he did not live in, and was not even "lawfully present" at, the Riggs Road home. The government relies on statements by Sheila, Rob, and Mr. Pope from the day of the arrest. Specifically, the government points to Mr. Pope's initial statements to officers that he did not live at the house and gave a different home address. However, at the suppression hearing, Mr. Pope gave a plausible explanation for his initial statements—that he actually slept at Sheila's house about half the time, but denied it when he was arrested to avoid Section Eight housing repercussions for his Aunt Sheila.[11] The government also pointed to Sheila's statement the day of Mr. Pope's arrest that he did not "stay there" and "hadn't been there in a minute," and Rob's statement that he "told [Mr. Pope] not to come around here no more," as evidence that Mr. Pope was trespassing when he entered the house. But placed in context, those statements also fail to undermine the reasonableness of his expectation of privacy. For example, Rob followed up his comment to police that he previously told Mr. Pope to stay away by noting "I should have kept it like that," indicating Rob had relented and let Mr. Pope

---

[11] Mr. Pope testified that the other half he spent at his grandmother's house.

return to the house. The record does not support that Mr. Pope was a stranger or trespasser because Sheila told the officers that Mr. Pope, while not a relative, is "just a friend" who "[comes] around here" and that he hangs out "with my son." On the bodyworn camera footage she is heard telling the officers that he calls her "Aunt Sheila." At the suppression hearing, the government elicited from Mr. Pope that, once arrested when asked what he wanted done with his possessions, he told Officer Van Hook to "just leave it with Aunt Sheila." His request to leave his belongings at Sheila's house appears on the bodyworn camera footage and appears to have been readily accepted by the officers, who are heard saying they will inform her—a further indication of his relationship with the house and its residents. Moreover, Mr. Pope testified that at the time of the suppression hearing he was staying with Sheila, in a different house. The government did not challenge this assertion and introduced no evidence to the contrary. Although Mr. Pope's living arrangements at the time of the suppression hearing are not dispositive of his living arrangements at the time his backpack was seized and searched, they corroborate his testimony that he was close to the family and stayed with them. The fact that Mr. Pope referred to "Aunt Sheila" and "Cousin Rob" further supports a relationship between them that would give rise to an expectation that his possessions would be safe in their home.

There is another point that raises a significant question about Mr. Pope's status vis a vis the household on the day of the chase. We know from the officers and

Sheila that Mr. Pope ran into the house. However, when the officers arrived at the back door it was locked and they had to knock before they could enter. Mr. Pope said he double locked the door behind him. The question naturally arises: How was Mr. Pope able to run into the house, apparently without delay or impediment? Possibly the door was unlocked. But also possibly he was allowed in by one of the occupants, or he had a key. The answer would shed light on whether Mr. Pope's presence was welcome or, at least, not unexpected—or whether he simply barged in. But the officers did not question Mr. Pope, Sheila or Rob on this point at the time, nor did the government develop the record in this regard at the suppression hearing.

The question before us in this appeal is whether the government proved with the requisite certainty that a person with Mr. Pope's connections to the house and its residents would be unreasonable in their expectation that a closed backpack he took pains to conceal would remain private. We lack specific findings about the frequency and nature of Mr. Pope's visits to the house and his relationship to its residents, whether he lived there part of the time and regularly kept some of his belongings in the basement, or how he gained entry to the house when he ran in on the day he was chased. We have considered whether to remand the case for further fact-finding and decided against it. All told, even without these specific findings, we can conclude as a matter of law that the record in this case falls far short from permitting a finding by "clear, unequivocal and decisive" evidence that Mr. Pope

abandoned his backpack.[12] Whether or not he sometimes lived at the house, and even if he had been asked to stay away at some point (apparently subsequently rescinded), the question is whether he had a basis in "prior experience from which to derive an expectation of privacy there." (*Thomas J.*) *Brown v. United States*, 627 A.2d 499, 503 (D.C. 1993) (referring to "normal expectations of privacy enjoyed by homeowners (or renters), or even their overnight guests"); *cf. Kyle*, 268 A.3d at 1259-60 (holding no reasonable expectation of privacy in someone else's backyard when there is no evidence of any connection between defendant and homeowner). The government had a heightened burden to show that Mr. Pope's past experience did not provide such basis for his expectation of privacy. It did not meet that burden as, notwithstanding gaps in fact-finding, the record makes clear that, at a minimum, Mr. Pope was friendly with the residents and had been a social guest in the house. The record suggests it is quite possible the relationship was much closer. *Cf.* (*Thomas J.*) *Brown*, 627 A.2d at 503 (no reasonable expectation of privacy where police entered through an open back door and Thomas was not a resident of the

---

[12] The officers had no legal justification, no warrant, and searched the basement and the backpack without asking anyone for permission. The record is clear as to Mr. Pope's intention to keep his backpack safely hidden in Sheila's basement. The record is silent as to whether Sheila or Rob would have looked into the closed backpack had they found it in the basement, or whether, if asked by the officers, they would have freely consented to a warrantless police search of their basement and Mr. Pope's backpack. It was the government's burden to establish facts from which these inferences could be drawn.

building, nor an invitee, and "had never even been in the apartment building before").[13]

There is no procedural unfairness affirming the trial court's ruling on this alternative ground. The government knew that the admissibility of the gun hinged on its argument that Mr. Pope abandoned the backpack. Our cases have long established the high burden the government must shoulder to prove abandonment and the suppression hearing provided an opportunity to develop the record to meet that burden.

On this record, we have more than enough evidence to conclude, bearing in mind the government's high burden to prove abandonment, that Mr. Pope had a reasonable expectation of privacy in his backpack. The trial court found that, however one described Mr. Pope's actions in the basement, his intention was to hide the backpack. This satisfies the subjective prong of the abandonment inquiry. Considering the evidence of a past (and possibly ongoing) relationship between Mr.

---

[13] The question of Mr. Pope's expectation that his belongings would be private hidden in the basement is different from whether Mr. Pope could challenge the officers' warrantless entry into the home. The government argues that the trial court determined he did not, while appellee says the issue was ultimately left undecided and remand is necessary for further fact-finding to resolve that question. Because we affirm the trial court's ruling on the ground that the government failed to meet its burden of proof that Mr. Pope relinquished his expectation of privacy in the backpack, it is unnecessary to resolve the issue of the legality of the officers' entry into the home.

Pope and Sheila and Rob, Mr. Pope's evident intention to secure his claim of privacy in his backpack was not objectively unreasonable.[14]

### III.    Conclusion

For the foregoing reasons, we reject the trial court's determination that the gun was the unlawful fruit of an illegal seizure, but affirm the trial court's ruling suppressing the gun on the alternative ground that the government failed to prove that Mr. Pope relinquished his Fourth Amendment privacy interest to challenge the concededly unjustified search of his backpack.

*So ordered.*

---

[14] We have no need to decide whether, as appellee argues, the evidence would not permit a finding of abandonment even under a preponderance of the evidence standard.